852 F.2d 568
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Helen F. COLE, individually and as natural parent of Ricky
Cole, and William L. Cole, Plaintiffs-Appellants,
v.
The GENERAL MOTORS CORPORATION, Defendant-Appellee.
 No. 87-5966.
 United States Court of Appeals, Sixth Circuit.
 July 21, 1988.
 
 Before MILBURN, RALPH B. GUY, Jr., and ALAN E. NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiffs appeal the district court's decision granting summary judgment in favor of defendant in this products liability action. Jurisdiction was based on diversity of citizenship between the parties. For the following reasons, the judgment of the district court is affirmed.
 
 I.
 
 2
 On the evening of February 16, 1982, plaintiff, Helen F. Cole, was preparing to enter her car when she was struck by a 1978 Chevrolet Caprice automobile manufactured by the defendant, General Motors Corporation, and owned and operated by Walter B. Locke. Mrs. Cole has no recollection of the accident which resulted in the amputation of her left leg and other unspecified internal injuries. A friend of Mrs. Cole, Mary Ann Stalsworth, who was with her the evening of the accident, testified that she heard a loud roar, looked up and saw the oncoming automobile with the head lights off, and the left turn signal flashing. Ms. Stalsworth testified that she saw the vehicle driven by Locke hit Mrs. Cole, careen off the Coles' automobile and crash into a building adjacent to the side of the street where the Coles' vehicle was parked. Mr. Cole, who was also present at the accident, described the oncoming automobile as a "blur" and heard the sound of its engine revving prior to the impact.
 
 
 3
 Walter B. Locke, the driver of the 1978 Chevrolet Caprice, died prior to the trial in this case, but his testimony was preserved in a deposition taken on June 28, 1984. Locke stated that he had purchased the Caprice from his mother-in-law approximately three months prior to the accident. At the time he bought the automobile, the odometer registered approximately 38,000 miles and, at the time of the accident, it had approximately 42,000 miles on it. The automobile was equipped with bench-type seats, cruise control, air conditioning, and power brakes. According to Locke, the following series of events culminated in the accident and the injuries to Helen Cole. Locke had parallel parked his car along the north side of Wall Avenue behind a parked truck. As he prepared to leave, Locke started the engine with his right hand turning the ignition key. Locke then shifted the transmission from the park position to reverse and accelerated slightly to back up a few feet in order to clear the truck parked in front of him. Locke applied his brake to stop the backward movement of the automobile and, with his foot still on the brake, shifted from reverse to drive, whereupon the automobile "just took off." Locke testified that he was unable to gain control of, or slow, the automobile as it accelerated along and across Wall Avenue, striking Mrs. Cole, the Coles' automobile, and ending up against the wall of a building. Mr. Locke stated that he used only the right foot to operate the brake and the accelerator and that he believed his foot remained on the brake from the time he shifted into the "drive" position.
 
 
 4
 Immediately following the accident, the automobile was examined by a Chevrolet dealership where it had been originally purchased. The inspection did not reveal any problem with the cruise control or any other mechanism affecting the acceleration system or the brakes of the automobile. The Locke automobile required some body work but no mechanical repair work was done due to the braking or acceleration systems. Locke testified that he had never experienced any problems with the cruise control system or the acceleration system prior to the accident, but he stated that the former owner, his mother-in-law, had complained of such a problem. Audra Potter, the original owner of the vehicle, testified that she had experienced an incident of sudden acceleration approximately one year before the February accident involving Mrs. Cole. Mrs. Potter testified that the car had suddenly accelerated from a parked position and that she had been unable to slow the car by using the brakes and was forced to turn off the ignition in order to bring the car to a halt. Following this occurrence, she had the car examined by the Chevrolet dealership and by an independent mechanic, but neither found anything wrong with the automobile.
 
 
 5
 In addition to the foregoing evidence, plaintiffs also called two expert witnesses to testify at trial, Donald E. Waldecker and Lynn L. Bradford. In October 1985, Mr. Waldecker, an experienced mechanic and automotive consultant, examined the 1978 Chevrolet Caprice involved in the accident. At the time of the examination, the odometer indicated approximately 60,000 miles and Mr. Waldecker was informed that the car had not been driven for approximately one year. Mr. Waldecker found the vehicle in generally good condition, including the suspension, the brake system, the throttle controls and linkage, and the cruise control system. The only abnormality which Waldecker found with the cruise control system related to the vacuum release valve which was located beneath the brake pedal. He found that, due to the presence of some grit, the vacuum switch plunger did not release the first time he attempted to cause such release by operating the brake pedal. Waldecker attempted to remove the switch in order to examine it more closely; however, it spontaneously released and he was unable thereafter to duplicate the sticking of the switch.
 
 
 6
 At trial, Mr. Waldecker described the operation of the cruise control system which was used in the 1978 Chevrolet Caprice. The engagement switch, the button inside of the turn signal lever, causes the cruise control to engage when it is pressed and released while the car is operating in excess of the "low speed limit." As a result of road testing the subject automobile, Waldecker found that the low speed limit was in the 25-27 miles per hour range, well within the vehicle specifications which calls for a low-speed range between 25 and 30 miles per hour. During the road test, Waldecker noted a "whipping" or "bouncing" of the speedometer needle indicator at low speeds; however, he stated that the needle indicator "smoothed out" as the speed increased so that there was no whipping or bouncing at speeds of 25-27 miles per hour. Waldecker also testified that the bouncing condition which he observed is usually one that will grow worse over time.
 
 
 7
 The transducer is the "brains" of the cruise control mechanism which controls the speed of the automobile through the use of a vacuum which operates the "servo," a bellows-type apparatus linked to the throttle. Upon application of the brake pedal, the brake cut-off switch/electric switch disconnects power to the transducer, thereby immediately releasing the vacuum, and thus disengaging the cruise control system. In addition, the vacuum release valve, which is also attached to the brake pedal, serves as a backup release mechanism and disengages the cruise control if, for some reason, the electrical switch does not work.
 
 
 8
 Mr. Waldecker described a scenario which he felt could have produced the events which lead to the accident:
 
 
 9
 1. The cruise control engage switch in the end of the turn signal lever was inadvertently engaged by the depression of the button.
 
 
 10
 2. The speedometer cables "whipped" or "bounced" so as to produce a false speed indication in excess of 25 miles per hour.
 
 
 11
 3. The speedometer cable "bounce" occurred at the precise moment of the inadvertent engagement of the cruise control switch.
 
 
 12
 4. The electric cut-off switch was defective and permitted the cruise control to operate even though Locke's foot was on the brake at the time he shifted into drive and even though his foot remained on the brakes thereafter.
 
 
 13
 5. The vacuum cut-off switch malfunctioned and permitted the cruise control to operate even with Locke's foot was on the brake.
 
 
 14
 6. The automobile's braking system was defective and inoperative, since the brakes, as designed, are adequate to overcome the engine and stop the automobile.
 
 
 15
 Mr. Waldecker further testified that the cruise control system was, in his opinion, defective because of its susceptibility to inadvertent engagement which could have been avoided through the addition of a relatively inexpensive on/off switch in addition to the engage button at the end of the turn signal lever.
 
 
 16
 Plaintiffs' other expert witness was Mr. Lynn Bradford, a graduate engineer, and former head of the Office of Defects Investigation of the National Highway Transportation and Safety Administration (NHTSA). Mr. Bradford hypothesized essentially the same sequence of events suggested by Mr. Waldecker, i.e., an inadvertent actuation of the engaged button, which coincided with a speedometer bounce falsely indicating the speed in excess of 25 miles per hour, a defective electric cut-off switch, a defective vacuum switch, and defective brakes. Mr. Bradford also testified that an inadvertent actuation of the cruise control system could have been prevented by the presence of a separate on/off switch and that the absence of a separate switch constituted a defective condition.
 
 
 17
 At the close of plaintiffs' proofs, counsel for the defense moved for a directed verdict on the ground that no evidence had been presented which would permit the jury to find in favor of the plaintiffs. The court found that the evidence presented by the plaintiffs was insufficient to establish a causal connection between the alleged defect, i.e., the absence of an on/off switch for the cruise control mechanism, and the accident resulting in the injury suffered by the plaintiff Mrs. Cole. The court found that the plaintiffs' theory of causation would have required "the jury to draw inferences upon inferences" and that "[t]he proof has shown here without question that this accident was caused solely by driver error." (App. 485-86). Accordingly, based upon the undisputed evidence, the district court concluded that no reasonable juror could find the defendant, General Motors Corporation, liable for Mrs. Cole's injuries.
 
 II.
 
 18
 On appeal, plaintiffs contend that the direct and circumstantial evidence presented at trial was sufficient to create a jury question as to whether the plaintiff's injuries were causally connected to the allegedly defective design of the cruise control system.
 
 
 19
 We review the granting of a directed verdict by the trial court under the same standard used by that court in determining whether or not it was appropriate to grant the motion. Sawchik v. E.I. DuPont de Nemours & Co., 783 F.2d 635 (6th Cir.1986).
 
 
 20
 In considering a motion for a directed verdict under Rule 50(a), the trial court "must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury." O'Neill v. Kiledjian, 511 F.2d 511, 513 (6th Cir.1975). As applied in this context, "sufficient evidence" is such that, when viewed in the light of those inferences most favorable to the non-movant, Galloway v. U.S., 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1943), and Dowdell v. U.S. Industries, 495 F.2d 641, 643 (6th Cir.1974), there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable men could differ. Appellate courts apply this same standard. O'Neill v. Kiledjian, supra at 513,....
 
 
 21
 Milstead v. International Brotherhood of Teamsters, 580 F.2d 232, 235 (6th Cir.1978) (citations omitted), cert. denied, 454 U.S. 896 (1981).
 
 
 22
 We agree with the district court that the plaintiffs failed to produce sufficient evidence to support their theory of causation. First, there was no material evidence of an inadvertent actuation of the cruise control engage button. In his deposition, Mr. Locke did not state whether or not he used the turn signal immediately prior to the accident. In fact, he testified that his left hand remained on the steering wheel throughout the events immediately preceeding the collision. Mary Ann Stalsworth testified that she saw the turn signal on Locke's automobile flashing as it raced towards Mrs. Cole and her vehicle. Accepting this evidence as true, however, merely indicates that the turn signal had been activated. It is not direct evidence that Mr. Locke had also activated the cruise control mechanism.
 
 
 23
 Second, there is no evidence to show that the speedometer indicator "bounced" into the 25-27 miles per hour range thereby enabling the cruise control system to engage. In fact, the "whipping" or "bouncing" effect noted by Mr. Waldecker only occurred at low speeds, up to 13 or 14 miles per hour and "smoothed out" at higher speeds. Moreover, the phenomenon only occurred when the automobile was in motion. In his deposition, Locke testified that the vehicle suddenly accelerated from a standstill at the moment he shifted from reverse to drive; hence, it is unlikely that the cruise control could have been activated from a dead stop as hypothesized by plaintiffs.
 
 
 24
 Third, given the unlikelihood of the speedometer "bounce" it is even more unlikely that such an event would occur at the precise instant that Mr. Locke inadvertently activated the cruise control button located at the end of the turn signal lever.
 
 
 25
 Fourth, there was no evidence whatsoever that the electric brake switch was defective at any time. As previously noted, the electric switch is the primary mechanism used to disengage the cruise control immediately upon application of the brakes. Locke testified that his foot was on the brake pedal when he shifted from reverse to drive and that his foot remained on the brake pedal until the automobile came to a rest following the accident. Thus, in order for the cruise control to engage causing the accident, the electric brakes switch must have malfunctioned. Subsequent inspections of the car, however, revealed no defects or problems with the switch.
 
 
 26
 Fifth, Mr. Waldecker testified that he observed a sticking problem with the vacuum switch when he initially examined the automobile in 1985, but he was unable to duplicate the problem after repeated attempts. Mr. Waldecker attributed the malfunction of the vacuum release valve to grit which had accumulated on the switch. There was nothing to indicate that the switch did not function properly at the time of the accident which was three years prior to Waldecker's inspection. More importantly, it is undisputed that the vacuum release valve was merely a backup system, and that the electrical switch was the primary means of disengaging the cruise control system by applying the brakes. In fact, Waldecker admitted that the vacuum switch is redundant, and that some other automobile manufacturers do not even include this additional back up system on their cruise control mechanisms.
 
 
 27
 Finally, it is undisputed that proper application of the power brakes would have been sufficient to halt the vehicle even if the cruise control mechanism had been engaged and the throttle had remained open. Mr. Locke testified that his foot remained on the brake pedal from the time his vehicle "took off" until it crashed into the building after careening off of the Cole's automobile. Thus, in addition to the foregoing sequence of events, the jury would also have to assume the occurrence of a total failure or near total failure of the braking systems on Locke's automobile in order to establish a causal connection between the allegedly defective cruise control system and the accident which resulted in the injuries to Mrs. Cole. It was undisputed, however, that the inspection of the automobile conducted immediately after the accident did not reveal any problem with the braking system and that the brakes remained in good condition up until the time they were inspected by Mr. Waldecker in 1985.
 
 
 28
 We agree with the district court that the sequence of events alleged by the plaintiffs was so unlikely that no reasonable juror could have possibly found a causal connection between the alleged defect, i.e., the absence of an on/off switch on the cruise control mechanism, and the injuries suffered by Mrs. Cole as a result of the accident.
 
 III.
 
 29
 On appeal, plaintiffs also contend that the district court committed reversible error by granting defendant's motion for a protective order preventing the deposition of a General Motors' engineer. The trial in this case was scheduled to commence on June 30, 1987. On Monday, June 8, 1987, defendant General Motors was served with "notice of taking of deposition for production documents" noticing a deposition of a General Motors' employee, Ralph C. Morrison, and requesting a document production on June 15, 1987, in Warren, Michigan. The documents sought by the plaintiffs pertained to an investigation conducted by the NHTSA and similar internal investigations conducted by General Motors regarding complaints of sudden acceleration in automobiles manufactured by General Motors. On June 10, 1987, defendant moved for a protective order that the subject deposition not be taken and that the request for document production be denied on the grounds that: (1) plaintiffs had failed to give reasonable notice; (2) the witness, Ralph C. Morrison, had not been properly subpoenaed; (3) the documents requested had been produced earlier in response to discovery in a previous state court action between the parties; (4) the request for document production was not in accordance with the provisions of Fed.R.Civ.P. 34; and (5) the notice sought discovery which was oppressive, harassing, and unduly burdensome.
 
 
 30
 A hearing was held before the district court on June 12, 1987. During the course of the hearing, plaintiffs' counsel stated that the sole reason they sought to depose Mr. Morrison was to obtain access to the NHTSA and General Motors reports. Specifically, counsel for plaintiffs sought to obtain a portion of the reports referred to as "Attachment A." (App. 749-50). It was undisputed that the plaintiffs had already received copies of all the requested documents with the exception of the so-called "Attachment A."
 
 
 31
 The district court granted the defendant's motion for protective order in part, on the condition that defendant provide the plaintiffs with a copy of the "Attachment A." The court also ruled that the plaintiffs had not provided sufficient advance notice of the deposition, but offered to extend the period of time for discovery in the event that plaintiff still wished to depose Morrison or some other General Motors' employees regarding the information contained in Attachment A. Apparently, Attachment A was produced by the defendant to plaintiffs without objection and the record reflects no further efforts by plaintiffs to accomplish the further discovery along the lines sought in the deposition notice.
 
 
 32
 It is well established that the granting or denial of a motion for a protective order regarding a discovery request is a subject left to the sound discretion of the trial court. Chemical & Industrial Corp. v. Druffel, 301 F.2d 126 (6th Cir.1962). In the instant case, we find no abuse of discretion on the part of the district court in granting the defendant's motion for protective order preventing the deposition of Mr. Morrison. The court ordered the defendant to produce the documents requested by the plaintiffs, and the defendant apparently complied with the court's order. The plaintiff has not demonstrated any further reason for deposing Mr. Morrison, nor did the plaintiffs show that they suffered any prejudice as a result of their inability to depose him.
 
 IV.
 
 33
 Plaintiffs also contend that the court erred in denying their motion to depose Morrison after the trial and pending the appeal pursuant to Fed.R.Civ.P. 27(b). In their motion, plaintiffs claim that the post-trial deposition was necessary "to perpetuate" the testimony of Morrison. Plaintiffs claim that the depositions were necessary in light of newly discovered evidence. This newly discovered evidence consisted of newspaper articles describing problems with sudden acceleration in automobiles manufactured by other companies, namely, Audi and Nissan. In its memorandum and order denying the plaintiffs' motion, the district court found that this "newly discovered evidence" was irrelevant to the claims made against General Motors involving the 1978 Chevrolet Caprice. (App. 256). Moreover, the plaintiffs failed to make any showing that the requested deposition testimony would be lost if the plaintiffs were not permitted to depose Mr. Morrison and the other General Motors employees pending appeal. Such a showing is generally a prerequisite for the granting of a motion allowing a deposition to perpetuate testimony under Fed.R.Civ.P. 27(b). See Ash v. Cort, 512 F.2d 909 (3d Cir.1975).
 
 
 34
 Accordingly, we find that the district court did not abuse its discretion in denying the plaintiffs' post-trial motion requesting permission to take depositions pursuant to Fed.R.Civ.P. 27(b).
 
 V.
 
 35
 Finally, plaintiffs contend that the district court erred by restricting plaintiffs' proof on the issue of causation to a single specific defect, i.e., the failure in the cruise control mechanism. At trial, plaintiffs' counsel sought to introduce documentary evidence relating to the NHTSA investigation of complaints of sudden acceleration on more than fifty different models of General Motors' products including Cadillacs, Oldsmobiles, Chevrolets, Buicks, and Pontiacs manufactured from model years 1971-1986. The reports attributed the sudden acceleration problems to a variety of factors depending on the make and model of the automobiles involved. Some of the vehicle systems suspected of having caused the alleged problem included carburetors, fuel injection systems, and emission control systems, accelerator pedal and throttle linkages, computerized engine control systems, cruise control systems, power brakes systems, engine mounts, and automatic transmissions.
 
 
 36
 The district court excluded these reports from evidence on the grounds that they were hearsay, that they were irrelevant, and because the prejudicial effect far outweighed whatever minimal probative value they may have had.
 
 
 37
 In their response to defendant's interrogatories, plaintiffs alleged the existence of specific defects in the 1978 Chevrolet Caprice manufactured by the defendant, namely, the absence of an on/off switch on the cruise control system. The reports which plaintiffs sought to introduce described a wide variety of accidents and incidents occurring under various circumstances with many different types of vehicles, engines, and component parts. These reports are not directly relevant to the specific types of defect alleged in the instant case. Under these circumstances, we find that the district court did not abuse its discretion by excluding the reports under Rule 403 on the grounds that their probative value was substantially outweighed by the danger of unfair prejudice. See Brooks v. Chrysler Corp., 786 F.2d 1191 (D.C.Cir.1986) (upholding the trial court's exclusion of accident reports under Rule 403 in a products liability case against Chrysler Corporation where the accidents documented in the reports did not involve the specific type of defect and theory of causation alleged by the plaintiff).
 
 
 38
 For the foregoing reasons, the judgment of the district court directing the verdict in favor of defendant, General Motors, is AFFIRMED.