**Kathleen Madaline JARVIS, Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

**No. 92 Civ. 2900(NRB).**

United States District Court,
S.D. New York.

Oct. 27, 1999.

Brian P. Crosby, Gibson, McAskill & Crosby, Buffalo, NY, for defendant.

George N. Tompkins, Jr., Schnader, Harrison, Segal & Lewis, LLP, New York City, Thomas J. Murray, Murray & Murray Co., Sandusky, OH, for plaintiff.

## OPINION AND ORDER

BUCHWALD, District Judge.

Plaintiff Kathleen Madaline Jarvis ("plaintiff" or "Jarvis") filed this diversity action alleging that she was injured on July 14, 1991 when the 1991 Ford Aerostar she was operating suddenly accelerated and traveled into a ditch.[1] Plaintiff alleged that a design defect in the automobile's cruise control system caused the sudden acceleration. After a two-week trial, the jury returned a verdict finding that plaintiff's Aerostar was not defectively designed but that Ford Motor Company ("defendant" or "Ford") nevertheless had been negligent in the design of the vehicle. Additionally, the jury found Jarvis' own negligence to have been 35% responsible for her accident. The jury awarded damages for past and future medical insurance premiums, loss of earnings, and pain and suffering.

Presently pending is defendant's motion of August 11, 1999 ("Deft. 50(b) Memo"), pursuant to Fed.R.Civ.P. 50(b), for an order granting judgment to defendant as a matter of law, or, in the alternative, granting a new trial.[2] In support of its motion, defendant argues, first, that the jury's verdict was inconsistent because its finding that Ford was not strictly liable negates its finding of negligence and, second, that

1. The parties had consented on October 19, 1998 to trial pursuant to 28 U.S.C. § 636(c) before a magistrate judge, a position I held until September 24, 1999. The parties, aware of my impending elevation, understood that I would retain the case. Trial Transcript p. 1643 (hereinafter "Tr.").

2. Defendant's 50(b) motion is appropriate as Ford's attorney had timely made the prerequisite motion for judgment as a matter of law under Fed.R.Civ.P. 50(a). During the trial, plaintiff's 50(a) motion was granted to the extent that plaintiff's strict liability claim was dismissed inasmuch as it was based on a failure to warn theory. Tr. 1262.

the negligence finding is against the weight of the evidence. Defendant also moved on August 11, 1999 ("Deft. 4545 Memo") for an order reducing the verdict by the amount of collateral source payments plaintiff has received and will receive in the future pursuant to CPLR § 4545. Finally, defendant has asked the Court to rule on its motion to dismiss plaintiff's punitive damages claim originally filed on June 6, 1997 ("Deft. Punitives Memo").[3] Plaintiff has offered a response to each of these motions. (Respectively, "Pl. 50(b) Mem."; "Pl. 4545 Mem."; and "Pl. Punitives Reply"). We will discuss each of these motions in turn, with particular attention first to the issue of the jury verdict inconsistency and then to the sufficiency of the plaintiff's evidence.

## BACKGROUND

Plaintiff filed this products liability action pleading design defect causes of action under both strict liability and negligence theories. Plaintiff testified during the trial that she started her six-day-old Aerostar on July 14, 1991 in the driveway of her home in Woodstock, New York, with her foot on the brake and the car in "park."[4]

Tr. 73. According to the testimony, the vehicle proceeded to suddenly accelerate down the driveway. Tr. 74–75. Plaintiff testified that she attempted to stop the vehicle by stepping on the brake with both feet, but that the vehicle did not stop. Tr. 83–84. The vehicle traveled approximately 330 feet down the driveway, came to a stop in a drainage ditch, and overturned. Tr. 695.

The essence of plaintiff's claim is that the stand-alone cruise control in the 1991 Ford Aerostar[5] was defectively designed because, upon ignition, battery voltage will be supplied to the cruise control system (in particular, the servo component) and thus that the simultaneous occurrence of two transient electrical events could result in the car's throttle going to a wide open condition, causing a sudden, unintended acceleration of the vehicle without driver input. It was further plaintiff's position that the mechanical features of the car were not adequate to overcome an electrically-caused wide open throttle condition, i.e., that the design lacked a failsafe mechanism.[6]

Ford's position was, first, that the vehicle was properly designed to overcome

3. The trial was bifurcated to allow plaintiff to initially submit evidence on the issues of liability and compensatory damages with her claim for punitive damages deferred until after the jury's verdict. Pretrial Hearing of May 18, 1999, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Transcript p. 241 (hereinafter *"Daubert* Hearing Tr."). At the end of the presentation of evidence, defendant renewed its motion to dismiss the punitive damages claim. Tr. 1607. This court again reserved ruling until after the jury's verdict. *Id.*

4. Plaintiff testified as to facts related to both liability and compensatory damages together pursuant to a pretrial ruling in which the Court denied defendant's motion to separate the liability phase from the compensatory damage phase of the trial. This ruling was based in large measure on the representation by plaintiff's counsel that the plaintiff's injuries affected her ability to recall events and that the jury needed to hear damage testimony in order to be able to fully appreciate the liability testimony. After hearing the plaintiff

testify in court, however, it is now clear that an additional bifurcation between liability and compensatory damages would have been appropriate. Apart from plaintiff's testimony that she blacked out at the very end of the incident itself, plaintiff did not exhibit any memory problems on the witness stand, and her own expert psychiatric witness, Dr. Douglas Anderson, testified that plaintiff had a "very clear, vivid" recollection of the event. Tr. 149. The time period for which plaintiff's memory was compromised does not affect considerations of liability.

5. Plaintiff's expert acknowledged that this design was not unique to Ford automobiles. Tr. 919.

6. The Court's charge specifically instructed the jury to "decide whether the design of the cruise control system of the 1991 Aerostar considered in its entirety was defective" (Tr. 1590), and that they should consider the design of the cruise control components as well as the brakes and dump valve. Tr. 1496 ("the cruise control system along with the throttle body and the braking system."), 1591

even the statistically remote possibility that two simultaneous electrical events could occur, resulting in a wide open throttle. Second, Ford's position was that there was no evidence that the two simultaneous electrical faults postulated by the plaintiff's electrical engineering expert ever occurred in the plaintiff's vehicle, or that the vehicle did not have adequate mechanical back-ups, and indeed that the physical evidence was to the contrary. Moreover, Ford presented another explanation for the events which plaintiff described and which considered the testimony of other witnesses to the events as well as the physical evidence.

## DISCUSSION

### I. Verdict Inconsistencies

Defendants initially make this application to set aside the verdict as inherently inconsistent based on the jury's answer to two special verdict questions. First, the jury answered "no" to the question, "Do you find by a preponderance of the evidence that the cruise control system of the 1991 Ford Aerostar was designed in a defective manner?" Court Ex. 12. Second, the jury answered "yes" to the question, "Do you find by a preponderance of the evidence that the defendant Ford Motor Company was negligent in the design of the cruise control system in the 1991 Ford Aerostar?" *Id.* Defendant reasons that the jury's finding that the cruise control was not defective "precludes a finding, legally and logically, that Ford was negligent in designing the cruise control system." Deft. 50(b) Memo at 3. Plaintiff argues that the Court must make every attempt to reconcile the jury's answers on the verdict form to find a consistent way to

("[cruise control] system, including the dump valve").

7. Plaintiff's reliance on *Chase Manhattan Bank, N.A. v. T & N, plc,* 905 F.Supp. 107, 122 (S.D.N.Y.1995), to draw sharp distinctions between strict liability and negligence design defect claims is misplaced as *Chase* was decided two months before the Court of Appeals articulated their equivalency in *Denny.*

interpret the verdict, even if such a reading is "strained." Pl. 50(b) Mem. at 7 (citing *McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1311 (2d Cir.1993)). We find that the two jury determinations cannot be reconciled.

For nearly twenty years, lower courts in New York have found that the two theories of negligence and strict liability for design defect are "almost functionally equivalent." *DeRosa v. Remington Arms Co.,* 509 F.Supp. 762, 766–67 (E.D.N.Y. 1981) (Weinstein, J.) (citing *Lancaster Silo & Block v. Northern Propane Gas,* 75 A.D.2d 55, 427 N.Y.S.2d 1009, 1013 (4th Dep't 1980)). In *Denny v. Ford Motor Co.,* 87 N.Y.2d 248, 257–58, 639 N.Y.S.2d 250, 255–56, 662 N.E.2d 730, 735–36 (1995), New York's Court of Appeals formally endorsed this proposition for all design defect claims, citing several cases and law review articles to establish that negligence and strict liability design defect claims are "functionally synonymous" since the strict liability analysis is "negligence-inspired." *See also Gonzalez v. Morflo Industries, Inc.,* 931 F.Supp. 159, 164 n. 3 (E.D.N.Y. 1996) (citing *Denny* for proposition that "negligence and strict liability design defect claims are virtually indistinguishable"); *Enright v. Eli Lilly & Co.,* 77 N.Y.2d 377, 387, 568 N.Y.S.2d 550, 555–56, 570 N.E.2d 198, 203–04 (1991) (failure to warn claim, "though it may be couched in terms of strict liability, is indistinguishable from a negligence claim").[7]

As a consequence of this functional equivalence, defendant's position that a finding of no defect and a finding of negligence are inconsistent as a matter of law in a product liability case is well supported.[8] The Restatement (Third) of

8. While we readily admit that our pretrial research failed to learn of the wide acceptance of the equivalency of negligence and strict liability claims in design defect cases, we remain puzzled why this overlap was not brought to our attention given that defendant's attorney was also of counsel to defendant Ford in the *Denny* case. Although we are lacking in hard evidence, we similarly doubt whether plaintiff's three experienced

Torts instructs that "two or more factually identical defective-design claims ... should not be submitted to the trier of fact in the same case under different doctrinal labels." Restatement (Third) Torts § 2, cmt. n (warning that the submission of the same claim on "multiple theories of recovery ... would generate confusion and may well result in inconsistent results"). Accordingly, in New York, as in virtually all jurisdictions, in a products liability action premised on a design defect theory, a jury finding that the product is not defective precludes a parallel finding that the manufacturer is negligent in designing the product. *Lundgren v. McColgin*, 96 A.D.2d 706, 464 N.Y.S.2d 317 (4th Dep't 1983). After a jury finding of no strict liability but negligence in a pure design defect case, the *Lundgren* court held, "[t]he jury could not have concluded that [defendant] negligently designed the override system and at the same time conclude that it was reasonably safe for its intended use." 96 A.D.2d at 706, 464 N.Y.S.2d at 318.

Similarly, in *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1150 (6th Cir.1996), the Sixth Circuit held that "proof of a defective product is essential to the products liability or the negligence claim." According to the Sixth Circuit, the distinction between the two claims is of "no practical significance" and a jury finding of negligence without a finding of strict liability is "legally inconsistent." *Id.* (citations omitted). Another example is the case of *Witt v. Norfe, Inc.*, 725 F.2d 1277 (11th Cir. 1984). In *Witt*, the jury found for the defendant on the strict liability question as to whether a shower door was defective but, at the same time, found the defendant negligent. The Eleventh Circuit regarded the two findings as "irreconcilably contra-

dictory." 725 F.2d at 1280. *See also Romero v. International Harvester Co.*, 979 F.2d 1444 (10th Cir.1992) (jury verdict that defendant had "failed to exercise reasonable care" irreconcilable with jury verdict in favor of defendant on negligent design and strict liability claims).[9]

In this case, the jury was instructed with respect to the strict liability cause of action that:

> A product is defective if it is not reasonably safe—that is, if the product as designed is so likely to be harmful to persons or property that a reasonable person who had actual knowledge of its potential for producing injury would conclude that it should not have been marketed as designed.

Tr. 1589–90. With respect to the negligence cause of action, the jury was instructed:

> If you find that the 1991 Aerostar which plaintiff claims caused her injury was defective when put on the market by the Ford Motor Company, that with such a defect the vehicle was reasonably certain to be dangerous when put to normal use, that Ford failed to use reasonable care in designing the vehicle or in inspecting and testing it for defects, or that even though Ford used reasonable care in designing, inspecting, and testing the 1991 Aerostar, that Ford learned of the defect before putting the product on the market but did nothing about it, you will find that Ford was negligent.

Tr. 1592–93. As is evident in the charge, in order for the jury to find Ford negligent, it necessarily had to find that some defect existed in the cruise control. Thus, the jury's finding that there was no defect in the cruise control is inconsistent with its

---

counsel shared our unfamiliarity with this case law. Thus, we suspect that both sides elected for strategic reasons to refrain from informing us of the overlap and potential for inconsistent verdicts. Regardless, we analyze this case in conformity with the now-revealed governing case law.

**9.** State courts have made similar holdings in *Halvorson v. American Hoist & Derrick Co.*,

307 Minn. 48, 240 N.W.2d 303 (1976); *Lecy v. Bayliner Marine Corp.*, 94 Wash.App. 949, 973 P.2d 1110 (1999); and *Lambert v. General Motors*, 67 Cal.App.4th 1179, 79 Cal.Rptr.2d 657 (Cal.Ct.App.1998). Wisconsin is the only jurisdiction we have found with a contrary view. *Sharp v. Case Corp.*, 227 Wis.2d 1, 595 N.W.2d 380 (1999).

finding that Ford was negligent in designing the cruise control.

In apparent recognition of the force of Ford's argument, plaintiff has endeavored to recast her position from the pretrial and trial phases of this case. She now attempts to argue that a negligence finding is compatible with the jury's finding of no design defect because although the cruise control "in and of itself is not defective when operated in accordance with its intended design," the negligence lay in "designing the components of the cruise control system ... in such a way that those components can suddenly activate the throttle in a stationary vehicle." Pl. 50(b) Mem. at 12. Assuming that this distinction is more than semantics, plaintiff is attempting to distinguish a defect in the intended design from the plaintiff's use of the Aerostar. This interpretation, though, contradicts plaintiff's earlier position that she got in the car and turned it on *according to* its intended design. She testified, "I got up into the van, you know, I closed the door, put the seat belt on ... and I had my right foot on top of the brake, because that's how dad taught me back in 1967." Tr. 73. Plaintiff never introduced any evidence that she operated the vehicle in an unintended but reasonably foreseeable manner. This entire trial centered around whether the cruise control could be activated in a way that was unintended, regardless of driver input.[10]

Moreover, throughout the pretrial and trial phases, plaintiff's counsel was adamant that the jury could only reach one of two possible conclusions. As he asked the jurors, "this all comes down to was this driver error? Or was this a malfunction of the cruise control? In other words did [Jarvis] malfunction, or did the machine?". Tr. 32.[11] If, as plaintiff's counsel had maintained, these were the only options, then the jury's finding that the cruise control was not designed defectively surely negates Ford's negligence. As a result, the verdicts are irreconcilable.

### A. *Waiver*

Plaintiff alternatively argues that, even if the jury's verdict was inconsistent, Ford waived its challenge because it failed to object to either the charge or the special verdict questions. Citing *Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48 (2d Cir. 1992), plaintiff argues that defendant was required to object to the jury instructions prior to the jury retiring. Pl. 50(b) Mem. at 13. Defendant, who made the objection immediately after the jury's verdict and before the jury was discharged, cites *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884 (2d Cir.1988), in which the Second Circuit refused to find a waiver where counsel made the objection after the jury was discharged but before the trial court entered judgment.

■ We need not attempt to reconcile the *Lavoie* and *Auwood* decisions because, even assuming plaintiff's interpretation of the law is correct, defense counsel's failure to object cannot constitute a waiver because we clearly ruled in a pretrial conference that we intended to charge both negligence and strict liability. Pretrial Conference of July 12, 1999 at 27–28 (hereinafter "Pretrial Conf.").[12] At that

---

10. Again, the jury was charged that for purposes of this case, the cruise control system included the braking system.

11. *See also Daubert* Hearing Tr. 137 ("there [are] only two ways that this vehicle can do what Ms. Jarvis says it did: either a malfunction in the components of the cruise control or driver error. [These are] the only two possibilities"); Tr. 1547 ("there is only two ways something like this can happen. Only the drive[r's] foot or the cruise control can move the throttle to a wide open position"); Tr. 1579 ("it comes down to whether Kathy Jarvis knew the machine malfunctioned or she malfunctioned").

12. The dual charge issue had been raised in an exchange of correspondence with the Court pretrial and had culminated in our ruling the day before trial: "I don't believe that there's any authority that I'm aware of that would permit a court over the objection of a plaintiff to not charge negligence or not charge strict liability if the plaintiff wants them both charged. So since you want them both charged, I'll charge them." Pretrial Conf. 27–28.

conference, and at times previous to the conference, defense counsel made it clear that they believed the case should have gone to the jury on either a negligence or strict liability theory, but not both. Although it is true that defense counsel did not specifically object to our charge and special verdict questions on the ground that they could lead to inconsistent results, we cannot find a waiver because the defense's fundamental position on this issue had previously been expressed to the Court and, after our ruling at the pretrial conference, it was reasonable for defendant to conclude that future efforts to object would be unavailing. *See Anderson v. Branen,* 17 F.3d 552, 556–57 (2d Cir. 1994) (citing *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 178 (2d Cir.1992)).

## B. *Inconsistent Verdicts and Judgment as a Matter of Law*

Having decided that the verdict is fatally inconsistent, the next question is whether we should order a new trial or grant judgment as a matter of law to defendant.[13] Many courts faced with inconsistent design defect jury verdicts have found their plaintiffs' cases insufficient to sustain a jury verdict under any theory. For example, in the *Tipton* case described above, the court, finding that "the negligence theories that were not eliminated by the verdict of no defect ... were devoid of evidentiary support," directed the district court to enter judgment in favor of the defendant. 101 F.3d at 1151. Similarly, in *North American Catamaran Racing Assoc., Inc. v. McCollister,* 480 So.2d 669, 671 (Fla.Dist. Ct.App.1985), *review denied,* 492 So.2d 1333 (Fla.1986), a case in Florida in which a jury found a catamaran not defective but nonetheless found for the plaintiff, the court reversed the judgment and remanded for entry of judgment for defendant. *See also Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 286 (2d Cir.1998) (lack of specificity of jury verdict

was harmless in light of insufficiency of evidence); *Romero,* 979 F.2d at 1446 (entering judgment for defendant despite split jury verdict for plaintiff on "reasonable care" claim and for defendant on negligent design and strict liability claims).

Other courts have remanded cases with inconsistent verdicts back to the trial court for a new trial. *See Witt,* 725 F.2d at 1280 ("Because these findings are irreconcilably contradictory, we must remand for a new trial on the issue of liability"); *Lambert v. General Motors,* 67 Cal.App.4th at 1186, 79 Cal.Rptr.2d 657 ("The proper disposition, in our view, is to remand for a new trial"); *Lundgren,* 96 A.D.2d at 707, 464 N.Y.S.2d at 318 ("Judgment unanimously reversed on the law and facts ... and a new trial granted").

Because the case law is unclear as to whether the appropriate result is to grant a new trial or grant defendant judgment as a matter of law based on the inconsistent verdict, we instead analyze the evidence presented to determine whether, assuming that the jury had found for plaintiff on the strict· liability theory, we would have granted defendant judgment as a matter of law based on the sufficiency of the evidence adduced at trial.

## II. Sufficiency of the Evidence

Our discussion of the sufficiency of Jarvis' evidence is structured as follows: first, we will discuss the legal standards for judgment as a matter of law; second, we will discuss the controlling case law for design defect claims in New York; third, we will discuss the need for expert evidence in scientifically complex design defect cases such as this one; and fourth, we will discuss whether plaintiff has met her burden of proving that the claimed defect actually existed and caused plaintiff's injury.

---

**13.** Rule 50(b) provides that "if a jury returns a verdict for which there is not a legally sufficient evidentiary basis, the district court may either order a new trial or direct the

entry of judgment as a matter of law." *This Is Me, Inc. v. Taylor,* 157 F.3d 139, 142 (2d Cir.1998).

## A. The Legal Standard For Judgment as a Matter of Law

"Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor." *Williams v. County of Westchester*, 171 F.3d 98, 101 (2d Cir.1999) (quoting *Galdieri–Ambrosini*, 136 F.3d at 289). In considering a Rule 50 motion, the trial court "must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri–Ambrosini*, 136 F.3d at 289; *Kirsch v. Fleet Street Ltd.*, 148 F.3d 149, 161 (2d Cir.1998).

According to another formulation of the Second Circuit test, "judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Id.* (internal quotation marks and citations omitted). *See also, Doctor's Associates, Inc. v. Weible*, 92 F.3d 108, 111–12 (2d Cir.1996) (judgment as a matter of law is inappropriate unless there is "either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guesswork, or the evidence [is] so overwhelming that reasonable and fair-minded persons could only have reached an opposite result") (internal quotation marks and citations omitted). "A mere scintilla of evidence is insufficient to present a question for the jury." *Fane v. Zimmer*, 927 F.2d 124, 128 (2d Cir.1991) (quoting, *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 743 (2d Cir.1975)).[14]

## B. The Law of Design Defect

To prevail, plaintiff must prove that the 1991 Ford Aerostar was defectively designed. If plaintiff cannot establish that the vehicle was defectively designed for purposes of strict liability analysis, the case law on inconsistent verdicts (see *supra*, at section I) precludes a negligence finding based upon the same design defect. Therefore, our discussion focuses on the sufficiency of the strict liability claim. Only if the evidence supporting strict liability is sufficient would a new trial be ordered.

■ The governing law for design defect product liability in New York was summarized by the state's Court of Appeals in *Voss v. Black & Decker Manufacturing Co.*, 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 402, 450 N.E.2d 204, 208 (1983):

> In order to establish a prima facie case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury.

*See also McCarthy v. Olin Corp.*, 119 F.3d 148, 155 (2d Cir.1997) (same).

■ Generally, a plaintiff must provide enough evidence for a jury to conclude that a series of propositions are more likely true than not:

> (1) the product is "defective" because it is not reasonably safe as marketed; (2) the product was used for a normal purpose; (3) the defect was a substantial factor in causing the plaintiff's injuries;

14. One factor courts use to determine whether judgment as a matter of law is appropriate is whether plaintiffs have had a fair opportunity to prove their claim but they failed to do so. *See, e.g., Weisgram v. Marley Co.*, 169 F.3d 514, 517 n. 2 (8th Cir.1999). Here, plaintiff has not only been granted the opportunity to adduce her full case at trial, but she has also been the recipient of several favorable pretrial evidentiary rulings and had been allowed to amend the pretrial order twice to elicit new evidence. Tr. 1271.

(4) the plaintiff by the exercise of reasonable care would not have both discovered the defect and apprehended its danger; (5) the plaintiff would not have otherwise avoided the injury by the exercise of ordinary care.

*Urena v. Biro Manufacturing Co.,* 114 F.3d 359, 363 (2d Cir.1997) (citing *Fane,* 927 F.2d at 128; *Wolfgruber v. Upjohn Co.,* 72 A.D.2d 59, 62, 423 N.Y.S.2d 95, 97 (4th Dep't 1979), *aff'd,* 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980)). *See also Jones v. Lederle Laboratories,* 785 F.Supp. 1123, 1127 (E.D.N.Y.1992) ("Once [the] conclusion [that one of these propositions could not have reasonably been established based on the evidence] is reached, there is nothing left to the case").

■ New York's Court of Appeals has explained, "[s]ince no product may be completely accident proof, the ultimate question in determining whether an article is defectively designed involves a balancing of the likelihood of harm against the burden of taking precaution against that harm." *Robinson v. Reed–Prentice Div. of Package Mach. Co.,* 49 N.Y.2d 471, 479, 426 N.Y.S.2d 717, 720, 403 N.E.2d 440, 443 (1980) (citing *Micallef v. Miehle Co., Div. of Miehle–Goss Dexter, Inc.,* 39 N.Y.2d 376, 386, 384 N.Y.S.2d 115, 121, 348 N.E.2d 571, 577 (1976); 2 Harper and James, *Torts,* § 28.4). *See also Urena,* 114 F.3d at 363 (same). Courts have alternatively referred to the relevant balancing as that of "risk/utility analysis." *McCarthy,* 119 F.3d at 155; *Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 239, 677 N.Y.S.2d 764, 767–68, 700 N.E.2d 303, 306–07 (1998). Briefly, under the latter moniker, the test requires that a manufacturer be held strictly liable for harm caused by its product only if the risk of harm outweighs its utility. *Id.; Robinson,* 49 N.Y.2d at 479, 426 N.Y.S.2d at 720, 403 N.E.2d at 443 (citing Restatement (Second) of Torts § 402A).

· ■ Factors to be considered in determining whether a product is reasonably safe include: (1) the likelihood that the product will cause injury; (2) the product's utility to the public as a whole and to the individual user; (3) the technological and economic feasibility of a safer design; (4) the plaintiff's awareness of the danger and the ability to have avoided injury with careful use of the product; and (5) the manufacturer's ability to spread the cost of any safety-related design changes. *Gonzalez,* 931 F.Supp. at 164 (citing *Denny,* 87 N.Y.2d at 257, 639 N.Y.S.2d at 255, 662 N.E.2d at 735; *Voss,* 59 N.Y.2d at 109, 463 N.Y.S.2d at 402, 450 N.E.2d at 208; *Fallon v. Clifford B. Hannay & Son, Inc.,* 153 A.D.2d 95, 550 N.Y.S.2d 135 (3d Dep't 1989)).

Of these factors, the one that is clearly the most crucial in this case is the first. New York's Court of Appeals has said that any design defect plaintiff is "under an obligation" to present evidence that the product presents a "substantial likelihood of harm." *Voss,* 59 N.Y.2d at 108, 463 N.Y.S.2d at 402, 450 N.E.2d at 208. If a plaintiff cannot show that a product poses a substantial likelihood of harm, then she cannot make out her prima facie case. *Gonzalez,* 931 F.Supp. at 165 (citing *id.; Fallon,* 153 A.D.2d at 99, 550 N.Y.S.2d at 137). Thus, plaintiff's first burden is to demonstrate that there truly was a defect in the design.

■ Second, a design defect plaintiff is also under an affirmative burden to prove that the defect was a substantial factor in causing the plaintiff's injuries. *Urena,* 114 F.3d at 363. Where this burden is not met, the plaintiff's claim equally fails. *Jones,* 785 F.Supp. at 1127. Thus, even if a reasonable jury could find the product to be defectively designed, the plaintiff must establish by sufficient evidence in the record that the asserted defect was the proximate cause of the plaintiff's injuries. *Fane,* 927 F.2d at 130–131; *Doll v. Digital Equipment Corp.,* No. 93 Civ. 0359, 1996 WL 107111, at *1 (W.D.N.Y. Mar. 6, 1996) (citing *Cover v. Cohen,* 61 N.Y.2d 261, 473 N.Y.S.2d 378, 461 N.E.2d 864 (1984); *Voss,* 59 N.Y.2d 102, 463 N.Y.S.2d 398, 450 N.E.2d 204); *Crump v. Times Square*

*Stores,* 157 A.D.2d 768, 769, 550 N.Y.S.2d 373, 374–75 (2d Dep't 1990) (entering directed verdict where "plaintiffs failed to present sufficient evidence to indicate that the accident was caused by a design defect"). *See also McCarthy,* 119 F.3d at 155 (design defect cannot be shown simply on the basis of a product's inherent risks). "If there is no causal relationship between a defendant's product and a plaintiff's injury, the defendant cannot be held liable on any product liability theory advanced by the plaintiff's complaint." *Lawrence v. Sofamor, S.N.C.,* No. 95 Civ. 1507, 1999 WL 592689, at *5–6 (N.D.N.Y. Aug.2, 1999) (causation is "indispensable element for each element" of plaintiff's design defect claims).

### C. The Necessity of Expert Evidence

■ In a technical, scientific case such as this, expert evidence to support plaintiff's claim is essential. *See, e.g., Barnes v. Anderson,* 190 F.3d 47, 54–57 (2d Cir.1999) (to survive judgment as a matter of law, plaintiffs must produce expert evidence to prove proximate causation of medical injury); *In Re Joint Eastern & Southern District Asbestos Litigation,* 52 F.3d 1124, 1133 (2d Cir.1995) (noting need for expert evidence which can overcome the "unique difficulties" in complex tort cases); *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1223, 1262–63 (E.D.N.Y. 1985) (expert testimony as to probabilities "is particularly important when establishing causation in a product liability action"); [15] *Gold v. Dalkon Shield Claimants Trust,* No. B–82–383, 1998 WL 351456, at *3 (D.Conn. June 15, 1998) (without expert testimony "as to causation to link the defect to the injury, a reasonable jury could not find that the plaintiff has proved that the defect caused her specific injuries").

The Second Circuit's decision in *Fane,* 927 F.2d at 130–132, which upheld a trial court's directed verdict in a design defect case where the plaintiff failed to provide sufficient evidence of causation, is illustrative. Reviewing the trial record for claims of both negligence and strict liability, the court reasoned that the issue of causation was so scientifically complicated that it was "beyond the sphere of the ordinary juryman and required expert testimony." *Id.* Distinguishing the facts of *Voss,* the court pointed out that unlike a relatively straightforward case, such as an injury caused by a circular power saw, an expert is required where "no one knows for sure what happened." *Id.* at 131. In *Fane,* there were alternate theories as to precisely what started the chain of events that led to the plaintiff's injury. *Id.* Since the plaintiff's experts could not tie their theory to what actually happened to the plaintiff by any evidence, the Second Circuit found the plaintiff's testimony to be insufficient to establish causation. *Id.,* at 131–32 ("Nonexpert witnesses can only theorize as to how the leg was fractured and the device broken").

### D. The Plaintiff's Evidence

It is with these legal principles, concerning judgment as a matter of law, design defect, and the need for expert testimony, that we will review the evidence presented by the plaintiff. Specifically, we will review the evidence from the dual perspectives of: (a) whether plaintiff has established that the cruise control system of the 1991 Ford Aerostar ·was defectively designed and (b) whether, assuming that defect has been established as a matter of theory, plaintiff has sufficiently proven that the defect actually caused the plaintiff's injury. While these two issues are analytically distinct, it is difficult to parse the testimony here into the two subject areas without being either confusing or repetitive. Accordingly, our discussion is initially melded, but will be followed by a discussion of the basis for our conclusions on each issue.

---

**15.** Judge Weinstein cited to a Fifth Circuit case, *Perkins v. Volkswagen of America,* 596 F.2d 681, 682 (5th Cir.1979), which affirmed the entry of a directed verdict where the plaintiff's expert was not qualified to testify as to automobile design defects and plaintiff failed to establish causation. *Id.*

### 1. *Plaintiff's Description of the Accident*

According to the plaintiff, around 4:45 or 4:50 p.m. on July 14, 1991, she got into her Aerostar in order to move it from the middle of the driveway, where her father had left it. Tr. 69–70. She testified that, at the time, she was "ticked [ ] off" due to the sight of her father operating a chainsaw nearby, close to her eight-year-old son. Tr. 71–72. She said that she got into the Aerostar, closed the door, put on her seatbelt, put her right foot "lightly on the brake" and turned the ignition key. Tr. 73. She testified that she never moved the gear out of "park." Tr. 258–59. According to her testimony, "all of a sudden, the car went vroom and took off," kicking up gravel from the driveway behind it. Tr. 73–74.

Jarvis testified that, looking down to verify that her foot was on the brake, "pounding" the brake with "two feet pumping" and "holding onto the steering wheel with all of [her] might," she could not stop the vehicle. Tr. 74, 83–84, 255–59. At the same time, she testified that she maneuvered the vehicle to avoid three pedestrians ahead of her on the curved gravel driveway and a tree to one side of it. Tr. 74–75, 260. Along the way, she said she glanced down to the dash board, where she saw the speedometer "going up" and a brightly colored emergency light that read "brake." Tr. 80–81, 279–80. Jarvis testified that she remembered the car driving off the road and brushing up against saplings before she blacked out. Tr. 75.

Plaintiff called an accident reconstructionist, George David Pope ("Pope"),[16] to explain the events in a more technical fashion. According to Pope, the car traveled approximately 330 feet before it came to a rest in a drainage ditch and tipped over. Tr. 695. Assuming a wide open throttle condition,[17] he hypothesized that, "she was able to slow the vehicle to, I believe, 15 to 20 miles an hour as she went into the ditch and overturned." Tr. 702. Initially, Pope had examined the physical evidence for the possibility of brake failure ("Her initial comments were, my brakes weren't working and my brakes failed... that was the point of my initial investigation to evaluate was there a brake failure or not?") Tr. 700. Pope concluded, though, that there was nothing wrong with the braking system of the Jarvis vehicle. Tr. at 710.

### 2. *Plaintiff's Sudden Acceleration Theory*

Plaintiff called Samuel J. Sero ("Sero")[18] in its effort to explain to the

---

16. Pope has a bachelor's degree in mechanized engineering from the Rose Hulman Institute of Technology in Terre Haute, Indiana and an M.B.A. from Indiana University. Tr. 663–64. Earlier in his career, Pope designed automotive power brakes for the Bendix Corporation, where he rose to the position of engineering manager. Tr. 664. He is now a forensic engineer, and braking systems are involved in 25 to 30 percent of his work. Tr. 665–66.

17. It was agreed by parties that the wide open throttle condition under these circumstances is approximately 75 percent open.

18. Sero, a licensed electrical engineer, has a bachelor's degree in electrical engineering from the Carnegie Institute of Technology (now Carnegie Mellon University). Tr. 837. He worked for the Allegheny Power System for twelve years as a planning engineer, standards engineer, and finally as a transmission lines engineer, investigating and maintaining the flow of electricity through transmission lines and in people's homes. Tr. 837–39. Since 1979, Sero has worked as a private consultant, specializing in forensic engineering for attorneys and private businesses. Tr. 842. Sero has no professional experience whatsoever in the automobile industry and has no training in human factors, the study of how people do things and what will cause people to react. Tr. 917. Sero has not published the theory testified to here in any form, nor, by his own admission, is there any literature in the automotive engineering field that supports his theory. Tr. 918. Sero was not proffered as an accident reconstructionist, i.e., to explain what actually happened to the plaintiff's vehicle on July 14, 1991. Tr. 990; *Daubert* Hearing Tr. 137. Indeed, Sero would have been totally unqualified to offer such testimony as he never inspected the vehicle (Tr. 927), never tested the performance of the vehicle (Tr. 928), and never tested the mechanical features of the minivan. Tr. 948.

jury the theoretical basis for how a vehicle could suddenly accelerate without driver input. While Sero posed two theories, both involving simultaneous electrical faults, as to how an unintended wide open throttle condition could occur, Sero testified that his second scenario, involving the simultaneous grounding of the automobile's vent and vacuum wires, did not happen here. Tr. 955. Thus, we will focus only on the first theory.[19]

Under Sero's first (hereafter described without that adjective) theory, there must be both: (a) an open ground wire from the speed amplifier[20] and (b) a grounding of either the vent or the vacuum ("vac") wires.[21] Tr. 944. An open ground wire can result from looseness (usually due to corrosion or breakage), either at the point where the ground wire attaches to the amplifier or where the ground wire attaches to the metal of the car. A grounding of the vent or the vac wire can, according to Sero, occur if there is: (a) moisture or contaminate on the circuit board or at the connector to the speed amplifier (Tr.

873–74); (b) overheating of the circuit board causing it to "expand" or "bow up" (Tr. 875); or (c) a nick in the wire insulation that allows either wire to make contact with metal.

For the postulated wide open throttle condition to result in an accident (or, put another way, to constitute a defect), there must be no built-in mechanism to close the throttle, even assuming that the simultaneous, random electrical events could occur in "real life." According to Sero, "[t]here is no mechanism existent in this device to kill the power, take it to a failsafe condition, not one." Tr. 877. Sero rejects the dump valve—which vents the servo, releases vacuum pressure, and causes the throttle to close—as a failsafe mechanism because: (a) he asserts that unless you keep the brakes depressed, the electrical fault will not clear; (b) the dump valve itself may be misadjusted; and (c) the dump valve will not perform its function unless the driver knows to brake. In addition, Sero maintains that the braking system of the car will not function well if

**19.** On May 18, 1999, we held a pretrial hearing to determine the admissibility of Sero's testimony under *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). At the hearing, Sero postulated yet a third scenario. We found, however, that the third hypothesis did not meet the *Daubert* standards of admissibility. *Jarvis v. Ford Motor Co.*, No. 92 Civ. 2900, 1999 WL 461813, at *3–5 (S.D.N.Y. July 6, 1999). The admission of Sero's first two theories into evidence was based on plaintiff's representation that they would be connected by direct and circumstantial evidence to the incident at issue. 1999 WL 461813, at *5; *Daubert* Hearing Tr. 222–23. As the discussion *infra* will demonstrate, that promise was illusory. Additionally, at the *Daubert* hearing, plaintiff had argued that a blue ribbon panel assembled by the National Highway Traffic and Safety Administration ("NHTSA") to study sudden acceleration had been misled by Ford into believing that a cruise control malfunction could not cause sudden acceleration in a stationary vehicle. *Jarvis*, 1999 WL 461813, at *9; *Daubert* Hearing Tr. 206–09, 215. Given the full review of plaintiff's evidence at trial though, this argument likewise has proven to be far less convincing than the

representations at the evidentiary hearing. [A full discussion of the NHTSA study appears *infra*, at section II(D)(4)(c).] Were this case to be retried, the NHTSA finding ("[t]he occurrence of such simultaneous, undetectable failures is virtually impossible" Ex. F–4 at viii), combined with other weaknesses in Sero's findings, would make the admissibility of Sero's testimony problematic under Fed. R.Evid. 702. We remain mindful, though, of the Second Circuit's holding in *In Re Joint Eastern & Southern District Asbestos Litigation*, 52 F.3d 1124, which rejected a trial court's extension of *Daubert* to discount scientific evidence already before the jury. In keeping with the Second Circuit's admonishment, this decision is based on the sufficiency of plaintiff's evidence and not its weight.

**20.** The speed amplifier connects to the servo and controls the vent and vacuum wires, which in turn control the level of throttle needed to keep the car traveling at a particular speed.

**21.** The grounding of the vent or the vac wire involves an exposure of the wire plus its contact with metal. Thus, it may be said that three simultaneous events must occur. Tr. 945.

there is a wide open throttle condition because the vacuum assist to the brakes will be lost.

In sum, for Sero's theory to actually cause the accident that occurred here, four things or events must occur, two of them simultaneously and the others within seconds thereafter: (1) there must be an open ground wire from the speed amplifier; (2) there must be a grounding of the vent or the vac wire which involves both the exposure of the wire and its contact with metal; (3) there must be a failure of the dump valve; and (4) there must be a loss of braking power.

### 3. *An Evaluation of Plaintiff's Evidence*

We will examine first the evidence relating to the simultaneous, random electrical events that Sero posits. At the outset, we note that it is basic (and convenient) to Sero's theory that there will be no physical evidence that the electrical events occurred. Sero testified, "There will be no arc, no physical evidence left. There will be nothing left to prove it ever happened. It will be a random event" (Tr. 860) that "heals itself." Tr. 975.[22] Sero does not dispute, though, that shorts to ground can occur from breaks in the insulation, disconnections, etc., and that there would physical evidence of such an event.

Focusing first on the ground wire from the speed amplifier, Sero agreed that there was no evidence that the ground wire was not making full and firm electrical contact during the relevant time period, or that there was any physical damage to the ground wire or the insulation surrounding it. Tr. 926. Victor DeClercq ("DeClercq"),[23] a retired Ford engineer called by both sides to explain the components of the cruise control system, also testified that there was no physical evidence that the ground wires had shorted or become loose. Tr. 1366–67.[24] Under Sero's theory, the loose connection could be found where the ground wire attaches to the amplifier or where the ground wire attaches to the car's metal body. However, in contrast to DeClercq, who tested the wires electrically and found them sound, Sero did not perform electrical tests on the wire (Tr. 916) or x-ray the amplifier to see if the insulation was intact.[25] Tr. 926. Further, Sero postulated that the connection between the ground wire and the car could be flawed because of corrosion. However, Sero never inspected the vehicle and could only surmise that the Aerostar, owned by plaintiff for one week and with just over four hundred miles on it could have been corroded because Ford forgot to galvanize the car. Tr. 937. In short, there was no tangible or even inferential evidence to support the notion that the ground wire was loose or disconnected.[26]

22. Q [to Sero]: And you can't give us any external evidence to support that theory, can you?

A: There would be none. That's why it's a random event. Tr. 975.

23. DeClercq had been involved in the design and development of cruise control systems for Ford that were essentially the same as the one used in the plaintiff's 1991 Aerostar. An extended description of DeClercq's background appears at Tr. 1332–1347. In addition to his cruise control and electrical work at Ford, DeClercq designed circuitry for space satellites and the F–14 fighter aircraft.

24. In addition, DeClercq testified that Sero's postulation that the ground wire was loose or disconnected was impossible since the ground wire for the amplifier and the speedometer are identical and therefore the speedometer

would have read zero contrary to plaintiff's testimony that it was "going up" (Tr. 81) and read 30 to 35 m.p.h. (Tr. 278) or 40 to 45 m.p.h. (Tr. 279). Tr. 1367–68. Sero admitted he did not know whether or not the same ground wire served both the amplifier and the speedometer. Tr. 930 ("Quite honestly, I don't know in that device if the speedometer is running off the variable speed sensor and then input into a cluster module, or if it's actually a mechanical one").

25. The actual amplifier from the Jarvis vehicle was retrieved by Ford and was physically in the courtroom. Tr. 1349.

26. Plaintiff might point to the testimony of her father concerning the difficulties he had in getting the cruise control to work earlier that afternoon as evidence of an electrical malfunction. Tr. 304–07. Mr. Jarvis testified

The second, and simultaneous, electrical event that must occur is that there must be a grounding of either the vent or the vac wires. The vent and vac wires run between the servo and the cruise control module. They control the opening and closing of the throttle, which affects the speed of the car. For a grounding of either of these wires to occur, there must be: (a) moisture or debris on the printed circuit of the cruise control module, causing a fault; (b) moisture or debris in the connectors of the wires to the speed amplifier, causing a fault; or (c) a break in the insulation of the wire and the exposure of the wire to metal.

Again, there was no evidence in the trial record from which a reasonable jury could conclude that any of these situations occurred and led to a grounding of the vent or the vac wires. As for the moisture possibility, Sero did not explore what the weather actually was for the week that plaintiff owned the car, but did acknowledge that plaintiff had stated that the day of the accident was dry and sunny. Tr. 939. Nor did Sero test the speed amplifier to ascertain whether a direct infusion of water on the speed amplifier would create the condition postulated.[27] In contrast, Ford sprayed the inside of the engine to test Sero's hypothesis, with negative results. Tr. 1169–71, 1437. Moreover, the notion of debris in the circuit board is unsupported by any evidence at trial and is especially speculative in a car as new as the Jarvis vehicle. As for the possibility of a break in the insulation of the wires, Sero also testified that there was no evidence of

physical problems with the vent or the vac wires (Tr. 943), and he acknowledged that if there was no problem with the insulation of the wires, they cannot go to ground.[28] Tr. 915. Similarly, DeClercq testified that he examined the vent and vac wires and that there was no evidence that they were abraded or had gone to ground. Tr. 1367. DeClercq also tested the wires by applying one thousand volts to each and established that the insulation was good. Tr. 1388.

At trial, Sero proposed yet a fourth scenario for how either the vent or the vac wires could have gone to ground: the circuit board could have warped from the heat. While Sero posed this scenario, he agreed that the circuit board showed no evidence whatsoever of warping, suggesting instead that after warping, the circuit board would "contract" or "go back" into precisely the same shape. Tr. 876. Moreover, Sero had no knowledge of what the temperature was on the date of the accident, no idea if the car's windows were opened or closed, or whether the air conditioner had been on. In fact, he conceded that he had no evidence "to support the fact that it was warm enough inside the car to cause a warp in the [circuit] board." Tr. 959. Plaintiff's counsel's promise to connect up this meltdown theory to the facts of the case (Tr. 876) remained unfulfilled.[29]

Plaintiff never proffered evidence that any such moisture, contaminate, nicks, or "bowing" was present in plaintiff's Aerostar on the day of her accident. Tr. at 911–27. There was no direct or circumstantial

---

that, on the day of the incident, he had driven the car for the first time since he had given it a 20 foot test-drive at the car dealership. Tr. 323–26. Apart from the issue of whether Mr. Jarvis' difficulties arose from his limited familiarity and experience with the newly acquired car, the Sero theory is based on transient electrical events which do not, by their nature, last for hours or remain after the car has been turned off and restarted twice. Thus, Mr. Jarvis' experience does nor provide evidence of Sero's theory. Moreover, had Mr. Jarvis' difficulties stemmed from a permanent electrical fault, there would have been physical evidence of such a fault. However, as

noted, there is no such physical evidence in the record.

27. The amplifier is located in the interior of the car, essentially on the passenger, and not the engine, side of the vehicle. Tr. 1413.

28. Each of the wires is double insulated, all are snapped into place, and the entire circuit board has a conformal coating to protect the circuitry. Tr. 1360, 1421.

29. Compare DeClercq's testimony that it is standard for Ford to test its vehicles at temperatures of 120 degrees Fahrenheit. Tr. 1437.

evidence upon which a jury could reasonably conclude that either the vent or the vac wires in the Jarvis vehicle went to ground on July 14, 1991.

As noted earlier, it is an essential part of Sero's theory that the vehicle did not include mechanical devices that could have overcome the electrical events that allegedly caused the throttle to open significantly and result in an acceleration that was not intended. Ford maintains that the existence of the Aerostar's dump valve, a spring loaded plunger which is opened when the brake pedal is depressed approximately one half of an inch, is a sufficient mechanical redundancy.[30] If the dump valve is open (i.e., the brake pedal is depressed one half of an inch), it will mechanically release the vacuum and close the throttle, terminating any wide open throttle condition and returning the throttle to neutral.

This undisputed mechanical sequence is of importance in several contexts. First, it undermines plaintiff's own version of the accident, which was that she started the car with her foot on the brakes, and that with her foot on the brake, the car accelerated.[31] Indeed, plaintiff's expert witness, Pope, testified that with a functioning dump valve and plaintiff's foot on the brake, as she testified it was when she started the car, the vehicle could not have gone to wide open throttle or even moved from a standing start.[32] Tr. 754–55. The only evidence in the record was that the dump valve was in working order.[33] Tr. 1396–97.

Thus, again, assuming the two simultaneous electrical events, for the vehicle to have gone to a wide open throttle, plaintiff would have needed to release the brake, in turn releasing the dump valve, for the car to move. According to Sero, with the re-

**30.** It should be noted that the dump valve is opened before the brakes are actually engaged. Tr. 734.

**31.** Where the plaintiff's testimony as to his or her actual injury differs from the chain of events that would lead to an injury caused by the alleged defect, courts have been particularly willing to hold that no reasonable jury could find liability. *See, e.g., Dupper v. General Motors Corp.*, 887 F.2d 1089, 1989 WL 123650, at *5 (9th Cir.1989) (unpublished opinion) (upholding directed verdict in design defect case where "the appellant's own testimony does not support her [expert's] theory"); *Sanchez v. Stanley–Bostich, Inc.*, No. 98 Civ. 0494, 1999 WL 639703 (S.D.N.Y. Aug.23, 1999) (entering summary judgment where expert had testified that allegedly defective gun would fire when bumped, but where there was no evidence that the gun actually was bumped, causing it to fire inadvertently). *Cf. Bogosian v. Mercedes–Benz of North America, Inc.*, 104 F.3d 472, 479 (1st Cir.1997)(in reviewing exclusion of expert testimony, "[t]he district court appropriately found it very odd that [plaintiff] would present an expert witness who would testify that her own unwavering testimony was incorrect"). Here, a significant piece of plaintiff's testimony about the sequence of events was rejected by both Pope and Sero. Plaintiff testified that she believed the vehicle was in "park" when it suddenly accelerated, something Sero and Pope admitted is impossible if the transmission was functioning properly. Tr. at 715–16, 952–53. It

bears noting that on the eve of trial, in plaintiff's proposed voir dire questions, plaintiff, apparently realizing the impossibility of her testimony, requested that the court inform jurors that when Jarvis "shifted the gear from park to drive, the Ford Aerostar suddenly took off without any throttle or pedal application by Ms. Jarvis."

**32.** Sero agreed with Pope on this point:

Q [to Sero]: If somebody has their foot on the brake when they turn the ignition on, and the dump valve is open, what happens to the throttle?

A: Nothing.

Q: It remains in an idle position, doesn't it?

A: That's correct.

Q: So if somebody has their foot on the brake in this 1991 Aerostar, when they are starting it, the vehicle can't take off, can it?

A: Not until they release the brake. Tr. 946.

**33.** Sero, who never tested the dump valve (Tr. 948), conceded this point. He testified that the car would not accelerate from a standing start if the brake pedal were depressed and if the dump valve were properly installed and calibrated. Sero further admitted that he had no evidence that the dump valve was not properly functioning. Tr. 945–46, 949.

lease of the dump valve, the effects of the electrical fault will be reinstated, and with a closed dump valve, the vacuum will stay in the system permitting an open throttle. Even assuming that "reinstated" electrical faults and the closed dump valve combine to create a wide open throttle condition, plaintiff still needs to explain why re-application of the brakes would not open the dump valve, return the throttle to idle, and with additional braking, bring the car to a stop.

Sero's explanation is that there will be no vacuum remaining in the vacuum booster to assist the driver and thus the driver will not be able to use the other mechanical device, namely the brakes, to bring the vehicle to a halt.[34] Sero further postulated that the vacuum assist failed because the plaintiff, unaccustomed to anti-lock brakes, pumped the brakes instead of applying steady pressure in accordance with the driver's manual. Tr. 882. Sero offered his braking theory despite the fact that he had no experience designing brakes, never tested the brake system in the Jarvis Aerostar, did not know how many pumps of the brake can be made before the vacuum reservoir is exhausted (Tr. 963–64), and never tested the dump valve. Tr. 972.

In fact, plaintiff's other expert witness, Pope, who did have extensive experience in designing brakes,[35] gave testimony totally contrary to Sero's theory:

Q [to Pope]: Well, if the dump valve was fully operable, and if the dump valve is engaged at approximately half an inch of pedal travel and before the brakes are engaged, and you are at normal pumping phase, the dump valve is always going to be open, so you are never going to be out of vacuum assist, isn't that so?

A: As you phrase it, that's correct.

Q: Did you consider that when you were doing your analysis?

A: I considered that the dump valve was operating properly, the braking action would have brought it to a stop well before the ditch.

Q: Alternatively, if she believed she was applying the brake, and in fact was applying the accelerator, by putting the accelerator all the way to the floor in a pumping fashion with the parking brake engaged, the vehicle would continue on down its path, wouldn't it?

A: Yes.

Tr. 745–46. Thus, Pope rejects Sero's theory that you would lose vacuum assist under one version of events testified to by the plaintiff.[36]

Pope's testimony also totally undermined Sero's hypothesis that this accident occurred because plaintiff pumped the brakes rather than applying steady pressure:

Q [to Pope]: if plaintiff indicated then [sic] as the vehicle moved unexpectedly, she was pumping the brake under ordinary pumping, the dump valve would have remained open, and the vehicle would have stopped. Do you agree with that?

A: Yes.

Q: So she would have to have been mistaken on that application of brakes, right?

A: Or the dump valve malfunctioning.

---

**34.** The vacuum booster has the capability of adding approximately one thousand pounds of force to what a driver is applying to the pedal. Tr. 697.

**35.** Again, Pope testified that these events were not caused by a failure of either the front or the rear brakes. Tr. 710.

**36.** Pope admitted that the plaintiff's testimony that she pushed hard on the brake pedal is inconsistent with the absence of skid marks found on the driveway. Tr. 91–92, 749–50. Further, Pope testified that, if plaintiff had, as she testified, pushed as hard as she could on the brake, the vehicle would have been brought to a stop within 30–35 feet, even if the cruise control malfunctioned. Tr. at 729, 739.

Q: Absent a malfunctioning dump valve?

A: True.

Tr. 755. Again, it will be recalled that the only testimony in the record was that the dump valve was functioning properly. In fact, plaintiff never made a claim that the dump valve was not functioning properly— a claim far different from one for a design defect. Thus, based on the evidence offered by plaintiff's own expert witness, there is no support for Sero's assumption that the mechanical redundancies of the dump valve and brakes were insufficient to overcome a wide open throttle condition.

#### 4. Judgment as a Matter of Law

■ A review of the evidence demonstrates that it is completely insufficient to support liability under either a strict liability or a negligence theory and that reasonable and fair minded persons could only have reached a verdict for Ford. Plaintiff did not establish that the postulated simultaneous electrical faults were substantially likely to occur or, even assuming they did, that the mechanical features of the car would not have overcome the resulting wide open throttle condition. Further, even if a jury could have reasonably found for the plaintiff on the existence of a design defect, plaintiff has still failed to establish that the alleged defect in fact caused Jarvis' accident. Finally, defendant has presented an explanation of the events of July 14, 1991 that is so overwhelmingly in accord with the evidence adduced at trial that no reasonable jury could have found otherwise.

#### a. Substantial Likelihood of Harm

Focusing first on the prima facie element of substantial likelihood of harm, it is important to note that plaintiff has offered no evidence to suggest how frequently the alleged design defect is likely to occur. Sero could not even state the mathematical possibility of the two electrical faults occurring at the same time. *See Jarvis*, 1999 WL 461813, at *6 n. 16.[37] Plaintiff has absolutely no evidence of her own or support from external scientific literature[38] to allow a rational jury to even begin to engage in a balancing of this risk with the cruise control design's utility. *Liriano v. Hobart Corp.*, 132 F.3d 124, 131 n. 12 (2d Cir.1998); *McCarthy*, 119 F.3d at 155. *See also United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947) (Judge Learned Hand's famous expression of the need for mathematical balancing in negligence cases). In *Gonzalez v. Morflo Industries*, 931 F.Supp. at 165–66, the court noted that even though the plaintiff's experts offered a theory as to how the accident happened, they provided no evidence to suggest how often such an accident occurs and thus "failed to demonstrate even a meaningful, let alone 'substantial' likelihood" that the product would cause the type of harm experienced. *See also Aghabi v. Sebro*, 256 A.D.2d 287, 288, 681 N.Y.S.2d 333, 334 (2d Dep't 1998) (expert's "bare conclusory assertions . . . which consisted primarily of speculative allegations with no independent factual basis, were insufficient to raise a triable issue of fact and defeat [defendant's] motion for summary judgment").

Even if a jury could find that the 1991 Aerostar's cruise control bore a substantial likelihood of unintended activation, plaintiff still has not provided proof that the fault could not be overcome by the minivan's mechanical redundancies, namely its dump valve and brake system. First, Pope, plaintiff's knowledgeable brake witness, testified that if plaintiff started the car with her foot on the brake, the Aeros-

---

37. Defendant's statistical expert, Dr. Michele Vogler, compared the numbers of reported incidents of sudden acceleration incidents studied by Ford covering model years 1985 to 1992 to the number of vehicle trips for the Aerostars on the road during the same time period and concluded that, even assuming all were caused by a design defect, the potential for such an incident is approximately 1 in every 9.5 million ignition starts. Tr. at 1305.

38. Indeed, the external literature is to the contrary. *See* discussion of NHTSA study in section II(D)(4)(c),.

tar could not have gone to a wide open throttle or even moved because the dump valve would have prevented such a scenario. Second, Pope testified that if plaintiff was pumping the brakes as she testified, there would have been no loss of vacuum assist and the brakes would have stopped the car well before she reached the ditch. Thus, both the dump valve and the brakes as designed would have prevented this accident even assuming the unproven simultaneous undetectable electrical faults. Sero's inexpert hypothesizing to the contrary is simply not evidence.[39]

On this record, judgment must be entered for the defendant. It is not tenable that a jury could rationally find a substantial likelihood of harm from the Aerostar's cruise control design since plaintiff has not offered any evidence that the attenuated chain of events necessary to result in an accident is likely to occur, let alone with significant regularity. We note that, in her 50(b) motion papers, plaintiff never challenged the jury's finding that the product was not defective as being unsupported by the evidence. In fact, the plaintiff admitted, "there is nothing illogical in the jury finding that the system was not designed in a defective manner." Pl. 50(b) Mem. at 11. This also fatally undermines plaintiff's claim. See, e.g., Tipton, 101 F.3d at 1151.

Other courts have entered judgment under similar circumstances. The Fifth, Sixth, and Ninth Circuits have all either upheld or entered directed verdicts for defendants in cases of sudden acceleration injuries allegedly caused by faulty cruise control systems. In Dupper v. General Motors Corp., 887 F.2d 1089, 1989 WL 123650, at *3, the Ninth Circuit reviewed petitioner's claim that an additional "on/ off" switch for the cruise control would have made the mechanism safer and concluded that "[a]s a matter of law, the absence of such a switch does not make the system unreasonably dangerous."

In another unpublished opinion, the Sixth Circuit focused on a different aspect of the design defect claim, pointing out that the sequence of events that allegedly made the cruise control system defective was so unlikely as to allow for the district court's finding as a matter of law that the design was not defective. Cole v. General Motors Corp., 852 F.2d 568, 1988 WL 76522, at **3–5 (6th Cir.1988) (unpublished opinion). See also Lawrence v. General Motors Corp., 73 F.3d 587, 590 (5th Cir. 1996) (reversing jury verdict where plaintiff did not elaborate as to likelihood that alternate design could have avoided accident); Ashley v. General Motors Corp., 666 So.2d 1320 (La.Ct.App.1996) (reversing trial court's design defect verdict for plaintiff where plaintiffs failed to offer proof that the accelerator system deviated in any fashion from the identical system installed on similar cars and examination of car revealed no evidence of defect). But cf. Cole v. Ford Motor Co., 136 Or.App. 45, 900 P.2d 1059, 1063 (1995) (upholding a jury verdict for plaintiff in a sudden acceleration case after finding sufficient evidence in that record to sustain the outcome).

### b. Causation

We now turn to the analysis of the evidence from a causation or "substantial factor" perspective. For this discussion, we will assume that which we have found was not proven, namely that two, undetectable simultaneous electrical faults could have

---

**39.** While Sero offered theories as to why the dump valve and the brakes would not have prevented or overcome a wide open throttle condition, he did so without testing the Jarvis brakes or the dump valve, and without knowledge of the relationship between pumping and the vacuum reservoir. See Lawrence v. Sofamor, S.N.C., 1999 WL 592689, at *6 (plaintiff's expert "unqualified to testify on the issue" not sufficient evidence of design defect); see also Sita v. Danek Medical, Inc., 43 F.Supp.2d 245, 253 (E.D.N.Y.1999) (summary judgment appropriate in design defect case where plaintiff failed to explain discrepancies between expert's reports). Sero was neither proffered nor qualified as a braking expert at the pretrial Daubert hearing.

occurred in the Jarvis vehicle and overcome its dump valve and braking system on July 14, 1991. Even making this dubious assumption, plaintiff's evidence does not establish that it is more likely than not that the design of the Aerostar's cruise control system was a substantial factor in plaintiff's accident.

While Sero's testimony is replete with hypotheses and proffers of explanations of how plaintiff's accident could have happened, the record is empty of evidence that would support the proposition that the theoretical defect in fact caused the accident described by the plaintiff. It is undisputed that there is no physical evidence that any of the wires became loose or shorted to ground. Nor did Sero or any other witness called by plaintiff utilize available tests to ascertain the soundness of the wire's connections or insulation in the Jarvis Aerostar. Thus, Ford's testing evidence demonstrating that all wires and the circuit board were sound and showed no evidence of insulation breakage or grounding was uncontradicted. Likewise, Sero's hypotheses of moisture, contaminate and "bowing" [40] were not only not proven, but were rendered merely speculative at best by the absence of evidence as to the actual weather conditions on the day

of the incident, the newness of the vehicle, and Ford's tests on the Aerostar.[41]

■ In these circumstances, a verdict for the defendant is required. *Matthews v. Hyster Co.,* 854 F.2d 1166, 1169 (9th Cir.1988) (upholding a directed verdict where the plaintiff's expert "theorized that contaminants may have gotten into the brake system and caused the brakes to malfunction" but did not offer any proof to support this theory). *See also Browne v. McDonnell Douglas Corp.,* 698 F.2d 370, 371 (9th Cir.1982) ("where proximate causation is at issue [in a directed verdict case], the nonmoving party will not have met its burden if the evidence merely suggests the possibility that proximate cause exists"); *Mazzola v. Chrysler France, S.A.,* 470 F.Supp. 24, 26 (E.D.N.Y.1978) (jury notwithstanding the verdict in automobile design defect case where expert had testified as to theory of how accident could have happened but "had never examined the [plaintiff's] car" to verify theory).

The plaintiff's theory as to the dump valve and braking system is similarly troubled. For a jury to find that the Aerostar was defectively designed, plaintiff would need proof that the dump valve and braking system actually were unable to over-

---

**40.** As noted earlier, plaintiff never introduced, despite a promise from plaintiff's counsel to connect this hypothesis to the facts of this case, any evidence to support Sero's suggestion at trial that the speed amplifier circuit board could have warped from the heat and then resumed its pre-meltdown state without a trace of warping.

**41.** Nor is it sufficient for plaintiff to simply define away the need to present proof of its theory by suggesting that there will be no trace of the electrical events posited. First, this suggestion is undermined by Sero's admission that there are many scenarios under which there will be physical proof. Second, it must be recalled that NHTSA specifically rejected as "virtually impossible" the "occurrence of simultaneous, undetectable failures." Third, in the absence of evidence, plaintiff cannot meet its burden to establish that its version of events is more probable than not. It is, in part, because of the necessity of an expert's explanation for the events at issue

that we find it unreasonable to rely on the testimony of five other individuals who reported experiencing sudden accelerations in Ford Aerostars (Tr. 216, 401–04, 437, 461–62, 473), as well as an even greater number of complaints (totaling 560) investigated by Ford and catalogued in Attachment Q to the report of its investigation into alleged unintended acceleration incidents (Plaintiff's Ex. 271, hereinafter "the Updegrove Report"), as an adequate substitute for the presentation of a viable expert explanation of this incident. Whatever may or may not have happened to other individuals is not evidence of what actually happened to the Jarvis Aerostar on July 14, 1991. In reaching this conclusion, we do not mean to suggest that similar act evidence may not be significant in other design defect cases or that the testimony of other incidents could not have been probative of plaintiff's credibility had plaintiff surpassed her initial hurdle of establishing that the "defect" was more than theoretical.

come the hypothesized electrical events. However, plaintiff's proof was to the contrary. Pope's testimony was that a working dump valve and brake system would have stopped the car and prevented the incident. And the only evidence in the record is that both the brakes and the dump valve were in good working order. In fact, Pope testified that if plaintiff had been pressing hard on the brakes, as she claimed, the car would have stopped in 30 to 35 feet, approximately one-tenth of the 330 foot distance she actually traveled. Sero's theory that the brakes were inadequate because Jarvis pumped them instead of applying steady pressure is belied by his own lack of expertise in braking systems and human factors,[42] the fact that he never tested the brakes or dump valve, and the directly contradictory testimony of Pope.

In cases similar to the one at bar, judgment has been entered for the defendant. For example, in *Doll v. Digital Equipment*, the court entered judgment for the defendant based on the failure of the plaintiff's experts to "link the plaintiff's injuries to the design of defendant's [product]" or "to any faulty feature thereof." 1996 WL 107111, at *2. Specifically, the court criticized the plaintiff for offering only experts that were not able or not qualified to show that the asserted defect in fact caused the injury. *Id.* "This Court draws a line between reasonable inferences on the one hand and scintillas of evidence and conjecture and surmise on the other." *Id.* Such is the case here.

The Sixth and Ninth Circuits reached similar conclusions on the issue of causation in cruise control cases. In *Dupper*, the Ninth Circuit found it dispositive that plaintiff had offered no evidence that the cruise control system was defective at the time it was purchased, that it was defective when the accident occurred, or that its wear characteristics made it likely to cause the accident described. 887 F.2d 1089, 1989 WL 123650, at *5. Second, the Ninth Circuit pointed out that the plaintiff's own testimony had not supported her expert's

theory. *Id.* The Sixth Circuit case, *Cole v. General Motors Corp.*, is even closer to being on point. There, the court held that "the sequence of events alleged by the plaintiffs was so unlikely that no reasonable juror could have possibly found a causal connection between the alleged defect, i.e., the absence of an on/off switch on the cruise control mechanism, and the injuries suffered by [the plaintiff] as a result of the accident." 852 F.2d 568, 1988 WL 76522, at *5.

### c. *Overwhelming Evidence*

■ Alternatively, apart from the complete absence of evidence to support the jury verdict, there is such an overwhelming amount of evidence in favor of the defendant that reasonable and fair minded persons could not arrive at a verdict against it. *Galdieri–Ambrosini*, 136 F.3d at 289; *Kirsch*, 148 F.3d at 161. Ford, in addition to demonstrating essentially from plaintiff's own witnesses that the July 14, 1991 incident was not the result of plaintiff's sudden acceleration theory, also proffered an alternative scenario that was consistent with the evidence offered by third parties and received support from plaintiff's own witness Pope and the NHTSA governmental study. Ford's scenario was essentially as follows: Jarvis was unfamiliar with her brand new car, a minivan which was different from her previous low-riding car. Tr. 239–40. Under these circumstances, she started the car unaware that her father had set the parking brake (Tr. 280, 308), put her foot on the accelerator thinking it to be on the brake, and was startled when the engine started to race against the force of the parking brake. Continuing to believe that her foot was on the brake and not on the accelerator, plaintiff was unable to stop the car. This theory is supported by the following evidence:

(1) plaintiff's father's testimony that he set the parking brake (Tr. 308);

---

42. *See supra*, at note 39.

(2) plaintiff's own testimony that she saw the word "brake" lighted on the dashboard, which according to Pope means that the parking brake is set (Tr. 755–56);

(3) plaintiff's testimony that the speedometer was "going up" (Tr. 81) and read 30 to 35 m.p.h. (Tr. 278) or 40 to 45 m.p.h. (Tr. 279), which DeClercq testified was impossible if the ground wire was loose or disconnected since the ground wire for the amplifier and the speedometer are the same and the speedometer would have read zero (Tr. 1367–68);

(4) the testimony of eye witness Joanne Valentine–Simonian who witnessed the event while walking on the driveway and testified that she saw no rear brake lights illuminated on plaintiff's vehicle when it passed her (Tr. 425, 752);[43]

(5) the absence of skid marks in the gravel driveway (which would have supported plaintiff's claim that her foot was forcefully on the brake), as testified to by the investigating police officer who walked by the length of the driveway right after the accident looking for evidence (Tr. 91–92 749–50.);

(6) Pope's testimony that Ford's scenario of plaintiff pumping the accelerator with the parking brake on would have resulted in the engine racing sound that plaintiff and Valentine–Simonian reported (Tr. 730–31);[44]

(7) Pope's testimony that the cessation of the revving sound that Valentine–Simonian described could have indicated that plaintiff had taken her foot off the accelerator (as if she were pumping the brakes), which would also explain the slowing of the vehicle (Tr. 756);[45]

(8) The testimony of Pope as well as other Ford witnesses that if plaintiff was pumping the brakes instead of the accelerator, the car would have stopped. Tr. 739–46, 1150, 1371–74.

The reasonableness of Ford's position was supported, both generally and in certain specifics, by a study conducted by the National Highway Traffic Safety Administration ("NHTSA"), a division of the United States Department of Transportation, which was introduced into evidence as defendant's Exhibit F–4, and relied on by both sides during the trial. In 1989, NHTSA convened an independent panel[46] "to identify and evaluate factors which could potentially cause or contribute to the occurrence of 'Sudden Acceleration Incidents' (SAI)." In addition to convening the panel of independent experts, NHTSA also collected literature, case documentation, interviewed drivers, studied the fuelsystems, braking systems, and driving controls of the vehicles, received complete schematics for cruise control and other vehicle systems, and performed tests and experiments at NHTSA's Vehicle Research and Test Center. The panel selected ten vehicles about which there were numerous complaints (not including the Aerostar), noting that the specific vehicles chosen were representative of a much larger group.

The study reached a number of conclusions of particular relevance to the issues here. In connection with the panel's con-

---

**43.** As plaintiff's expert, Pope, and Ford's experts, DeClercq and Richard E. Keefer, explained, the rear brake lights would have been illuminated if plaintiff's foot was on the brake, as she testified. Tr. 706, 1163, 1352–58.

**44.** Keefer also testified that he had conducted experiments to establish this proposition. Tr. 1162–63.

**45.** An explanation Keefer also gave. Tr. 1163–64.

**46.** The curriculum vitae of all panel members are included in Appendix A to the Report. However, to convey the expertise of the panel, a few members are listed here: Dr. John B. Heywood, a Professor of Mechanical Engineering at the Massachusetts Institute of Technology ("M.I.T.") and the Director of the Sloan Automotive Laboratory at M.I.T.; Gary. L. Stecklein, Director Department of Vehicle Systems Research, Southwest Research Institute; and Dr. Phillip B. Sampson, Hunt Professor of Psychology, Tufts University.

sideration of cruise control systems as a potential cause of SAI, the panel considered a Sero-like theory.[47] With respect to the likelihood of simultaneous, intermittent electrical failures occurring, the report concluded:

> Extensive laboratory testing of the operation of cruise controls under stress from temperature extremes, power supply variations, EMI/FRI and high voltage discharges has demonstrated no failure modes of any relevance to SAI. Analysis of their circuitry shows that for nearly all controls designed in the past few years, two or more independent, intermittent failures would have to occur simultaneously to cause throttle opening in a way that would be difficult to detect after the incident. The occurrence of such simultaneous, undetectable failures is virtually impossible.

Ex. F–4 at vii. The report also states:

> While it is not extremely rare for an electronic part or solder joint to fail intermittently in a manner that is difficult to recognize or diagnose, the probability is extremely small for two or more parts or connections to fail simultaneously at exactly the right moment to cause an SAI, but then fail to do so during subsequent diagnostic tests.

*Id.* at 9. In rejecting cruise control faults as an explanation for SAI, the panel also relied on the fail-safe mechanical devises which disengage the cruise control when the brake pedal is depressed and the fact that simulated cruise control failures resulted in speeds that were "significantly less than those generated by drivers pressing their gas pedals to the floor." *Id.*

Acknowledging that there was a decrease in brake system effectiveness when a throttle was held wide-open, the NHTSA panel conducted experimental studies to ascertain the distance a vehicle would trav-el "after simulated worst-case cruise-control-induced acceleration lasting two seconds [accounting for slower than usual braking reaction time], followed by brake-pedal application." Applying 60 pounds of pressure, the stopping distances ranged from 17.1 feet to 78.8 feet, considerably less than the 330 feet the Jarvis vehicle traveled. The panel also tested braking distances with wide open throttles and with closed throttles, applying the brakes from a standing start and applying 60 pounds of pressure. For front-wheel drive cars, there was relatively little disparity between open and closed throttle situations; however, for rear-wheel drive cars there was substantially greater disparity.[48] *Id.* at 19. Nonetheless, the maximum distance for any vehicle was 120 feet. Indeed, the panel concluded: "for most SAI, the most plausible cause of an open throttle condition while attempting to brake is pedal misapplication, which is likely to be perceived as brake failure." *Id.* at ix.

Similarly, the NHTSA panel found that the wide open throttle "with apparent brake-failure condition characteristic of SAI almost always requires a pedal misapplication." *Id.* at 42. Apart from having eliminated other mechanical and electrical causes, the study relied on the fact that almost none of the incidents involved cars with manual transmissions, which require proper alignment of the pedals to put the car in motion. The panel also found that most of the vehicles with high reports of SAI were *inter alia* configured in a fashion that permitted simultaneous application of the brake and accelerator or had brakes with a soft feel that made it harder for a driver to realize that his or her foot was on the wrong pedal. In addition, the panel noted that "[r]eview of the data recently gathered by NHTSA reveals that the rate

---

47. Apparently one of the vehicles studied by NHTSA, the Mercedes 300E, had a cruise control system that is always powered like the Aerostar.

48. There was reliance by plaintiff on a reference in the NHTSA report to the effect that 175 to 200 pounds of pressure might be necessary to stop a vehicle under a wide open throttle condition. That reference was to test results involving efforts to stop high-powered, rear-wheel drive cars going in *reverse*. That is not the factual situation in Jarvis.

of complaints about unwanted engine power fall off precipitously with vehicle mileage, suggesting that familiarity is strongly related to complaint rate." *Id.* at 38. Further, if a "SAI is initiated by a pedal misapplication of which the driver is unaware, loss of control can occur." *Id.* at vii. Finally, the report detailed hypotheses, offered by human factors psychologists "to explain how sober, honest drivers" incorrectly believed that they had not pressed the wrong pedal. *Id.* at 42. NHTSA made a number of recommendations concerning the configuration of the brake and accelerator pedals and the installation of shift-locks in cars with automatic transmissions.[49] The NHTSA panel did not suggest any alteration in wiring designs of cars, nor did they endorse the alternate design Sero proposed, an additional on/off switch for the cruise control.

In short, Ford offered a theory that accounted for the objective facts and received support from plaintiff's own expert and the NHTSA study. *See American & Foreign Insurance Co. v. General Electric Co.*, 45 F.3d 135, 140 (6th Cir.1995) ("[w]here the evidence indicates that it is as likely that the incident was caused by factors other than those asserted, a verdict for the defendant is mandated since otherwise a verdict would be based on speculation and conjecture"). Thus, for the reasons set forth, Ford's motion for judgment pursuant to Rule 50(b) of the Federal Rules of Civil Procedure is granted.

## III. Defendant's Motion to Reduce the Verdict

Although not necessary to our holding, for the sake of completeness we will decide defendant's motions to reduce the verdict and dismiss plaintiff's punitive damages claim. With respect to defendant's motion to reduce the verdict, New York's collateral source rule is contained in CPLR § 4545(c) and provides that:

In any action brought to recover damages for personal injury ... where plaintiff seeks to recover for ... loss of earnings or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was or will, with reasonable certainty, be replaced or indemnified in whole or in part from any collateral source such as insurance [or] ... social security ... If the court finds that any such cost or expense was or will, with reasonable certainty, be replaced or indemnified from any collateral source, it shall reduce the amount of the award by such finding ...

"The burden is on the defendant to prove that a plaintiff's award should be reduced by payments received from collateral sources." *Damiano v. Exide Corp.*, 970 F.Supp. 222, 229 (S.D.N.Y.1997) (citations omitted).

At trial, plaintiff's own expert witness, Dr. Matityahu Marcus, testified that plaintiff has received a total of $94,194 in past social security payments and that the present value of her future payments totals $170,750. Dr. Marcus also testified that plaintiff has received a total of $91,760 in past payments from a private disability policy and the present value of her future payments from the disability policy totals $116,765. Thus, in sum, Dr. Marcus testified that plaintiff has received or will receive a total of $473,469 in collateral source payments.

Plaintiff attempts to disavow its own expert's testimony, calling it "speculative." Pl. 4545 Mem. at 3. Plaintiff argues that "[t]here is absolutely no evidence before the Court as to the basis for the payments, how long they will continue, the precise amounts of the payments and, most importantly, what the payments are intended to replace, if anything." *Id.* Plaintiff does not offer any specific information about which calculations performed by its expert may be erroneous. Instead, plaintiff alternatively argues that the Court should hold an evidentiary hearing on the collateral source issue. *Id.* at 5–6.

---

**49.** Shift-locks require the driver to apply the brakes in order to put the vehicle in gear.

██ An evidentiary hearing is unnecessary because, based on Dr. Marcus' testimony, we find that it is reasonably certain that plaintiff has received the collateral source payments calculated by Dr. Marcus and that she will continue to receive these payments in the future. Plaintiff has submitted no information that refutes the calculations made by her own expert, and there is no reason for the Court to doubt Dr. Marcus' testimony. Further, plaintiff's argument that she may not continue to receive benefits in the future is refuted by the testimony of her own doctors, who opined that she is permanently disabled, and any speculation that plaintiff may be able to work in the future cannot serve as a basis for finding that current collateral sources will no longer be available. *See Corbin v. Grand Union Co.*, No. 96 Civ. 4626, 1997 WL 739583, at *9 (S.D.N.Y. Nov.26, 1997) (citing *Frey v. Chester E. Smith & Sons, Inc.*, 751 F.Supp. 1052, 1056 (N.D.N.Y. 1990)).

## IV. Defendant's Motion to Dismiss Claim for Punitive Damages

 Under New York State law, punitive damages are available against parties whose acts or omissions amount to willful or wanton conduct "which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." *Home Insurance Co. v. American Home Products Corp.*, 75 N.Y.2d 196, 203–04, 551 N.Y.S.2d 481, 485–86, 550 N.E.2d 930, 934–35 (1990). "[P]unitive damages [are] available only where [the] defendant acts with evil and reprehensible motives." *Wallach Marine Corp. v. Donzi Marine Corp.*, 675 F.Supp. 838, 842 (S.D.N.Y.1987). The Second Circuit has held that the recklessness that will give rise to punitive damages "must be close to criminality" and like criminal behavior, must be "clearly established." *Ro-*

*ginsky v. Richardson–Merrell, Inc.*, 378 F.2d 832, 843 (2d Cir.1967) (citations omitted).

██ Plaintiff submits that the Updegrove Report, Ford "Hotline"[50] reports, and a warning in Ford's Parts and Service Division Manual supports its assertion that Ford acted with conscious disregard of the rights of others. Pl. Punitives Reply at 2. There is nothing in any of these exhibits[51] that supports plaintiff's claim that defendant's actions meet this exacting standard of moral culpability. While this evidence establishes that Ford was aware of, or at least concerned about, the potential for a sudden acceleration event, it does not establish that Ford consciously disregarded the risk. Rather, it shows that Ford affirmatively attempted to carefully monitor such complaints, albeit that Ford did not reach a conclusion consistent with plaintiff's theory herein.

In reaching our conclusion that Ford may not be held liable for punitive damages, we also rely on the fact that NHTSA, employing a blue ribbon panel, rejected the equivalent of plaintiff's theory and did not recommend any changes to cruise control systems like Ford's. NHTSA concluded:

> For SAI [Sudden Acceleration Incidents] in which there is no evidence of throttle sticking or cruise control malfunction, the inescapable conclusion is that these definitely involve the driver inadvertently pressing the accelerator instead of or in addition to the brake pedal.

Tr. 1243. Accordingly, defendant's motion is granted and plaintiff's claim for punitive damages is dismissed.

## CONCLUSION

When called upon to do so, a court must address whether a party has met its bur-

---

**50.** *See Jarvis,* 1999 WL 461813, at *7 n. 17 for a description of Ford's Hotline reports.

**51.** In reaching this result on the punitive damages motion, we do not rest on the fact that plaintiff's efforts to introduce the "Hotline" reports and the service manual into evidence at trial were rejected as we are familiar with both documents from the pretrial phase of the case.

den to survive a motion for judgment as a matter of law with reference to the evidence adduced at trial and the record as a whole. *Pahuta v. Massey–Ferguson,* 170 F.3d 125, 130 (2d Cir.1999). Our review of the evidence presented in this trial leads us to the conclusion that there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture. *In Re Joint Eastern & Southern District Asbestos Litigation,* 52 F.3d at 1131. For the reasons stated above, defendant's motion for judgment as a matter of law is granted and the plaintiff's case is, accordingly, dismissed. In addition, this court makes the following rulings for the sake of completeness: defendant's motions to reduce the verdict and to dismiss plaintiff's claim for punitive damages are granted.